## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## BECKLEY DIVISION

| | |
|---|---|
| PHILLIP CLINE, | ) |
| | ) |
| **Plaintiff,** | ) |
| | )    **Civil Action No. 5:17-02391** |
| **v.** | ) |
| | ) |
| DR. ALLEN, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court is Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 16.), filed on August 30, 2017. The Court notified Plaintiff pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by Defendants in moving to dismiss. (Document No. 18.) Plaintiff has filed his Response on September 25, 2017. (Document No. 19.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant in part and deny in part Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 16).

## PROCEDURAL BACKGROUND

On April 19, 2017, Plaintiff, acting *pro se*[1] and an inmate at FCI Beckley, filed his Complaint in this matter claiming entitlement to relief pursuant to <u>Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971) and

---

[1]    Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer, and therefore they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Brief in Support. (Document Nos. 1 and 2.) Plaintiff names the following as Defendants: (1) Dr. Allen, Regional Medical Director; (2) Dr. Dominic McLain; (3) P.A. Steven Hutchinson; and (4) Kevin Thompson, Medical Director at FCI Beckley. (Document No. 1, pp. 4 - 6.) Plaintiff alleges that Defendants are acting with deliberate indifference in providing medical treatment for his "catastrophic back and leg injury which he suffered in an automobile accident in 1991." (Document No. 2, p. 3.) Plaintiff alleges that he has been examined by two outside neurosurgeons since 2009, but Defendants have ignored their recommendation causing Plaintiff to experience "ongoing and debilitating pain." (Document No. 1, p. 4.) Plaintiff states that "this in turn has caused severe consequences to Plaintiff's health," such as obesity, a torn meniscus, high blood pressure, and diabetes. (Id., pp. 4 – 5.) Plaintiff alleges that two independent neurosurgeons, Dr. Jeffrey Greenburg and Dr. John Feldenzer, recommended that Plaintiff be treated for chronic pain. (Document No. 2, p. 11.) Plaintiff explains that on September 8, 2016, Dr. Feldenzer recommended that Plaintiff be referred to a pain management clinic and noted that "a spinal cord stimulator or morphine pump may be of benefit." (Document No. 2, p. 9.) Plaintiff alleges that Defendants Allen and Thomas are acting with deliberate indifference by failing to transfer Plaintiff to an appropriate medical facility where the "recommended treatment would improve Plaintiff's health and quality of life." (Id., p. 10) Plaintiff complains that Defendants McLain and Thompson have continued to provide the same medical treatment "year after year, with little or no affect." (Document No. 1, pp. 5 – 6 and Document No. 2, p. 10.) Plaintiff states that Defendants McLain and Thompson are aware that the medical treatment is ineffective, but continue to provide the same treatment. (Id.) Plaintiff complains that Defendant Hutchinson continues to prescribe medications "that do little to alleviate Plaintiff's serious medical condition." (Id.) As relief, Plaintiff requests monetary damages

and a transfer to "a medical facility that will be able to treat his serious medical needs as required."[2] (Document No. 1, p. 5 and Document No. 2, p. 3.)

As Exhibits, Plaintiff attaches a copy of the following: (1) A copy of Plaintiff's Central Office Administrative Remedy Appeal dated June 6, 2016 (Administrative Remedy ID No. 857380-A1) (Document 2, pp. 21 - 22); (2) A copy of Administrator Ian Connor's Response denying Plaintiff's appeal (Administrative Remedy ID No. 857380-A1) (Id., p. 23.); and (3) A copy of Dr. John Feldenzer's medical report dated September 8, 2016 (Id., pp. 24 – 26.)

On May 22, 2017, Plaintiff paid the $400.00 filing fee. (Document No. 5.) By Order entered on May 23, 2017, the undersigned directed the Clerk to issue process. (Document No. 6.) The Clerk issued process on the same day. (Document No. 7.) On August 30, 2017, the Defendants' filed a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 16 and 17.) Defendants argue that Plaintiff's claim should be dismissed based on the following: (1) "Plaintiff's attempt to relitigate his Bivens claims from 2011 is barred by collateral estoppel" (Document No. 17, pp. 5 – 6.); (2) Plaintiff cannot establish a claim of deliberate indifference to his medical condition (Id., pp. 7 – 12.); (3) Defendants are entitled to qualified immunity (Id., pp. 12 – 14.); and (4) "Supervisory liability is inapplicable in a Bivens action" (Id., pp. 14 – 15.).

In support, Defendants attach the following Exhibits: (1) The Declaration of Dominick McLain (Document No. 16-1); (2) A copy of Plaintiff's pertinent medical records (Document No. 16-2); (3) A copy of a Memorandum dated March 2, 2012, denying Plaintiff's request for transfer

---

[2] A review of the Federal Bureau of Prisons' Inmate Locator reveals that Plaintiff was released from BOP custody on January 22, 2018.

(Document No. 16-3.); (4) The Declaration of Jeffery Allen (Document No. 16-4, pp. 1 - 3.); (5) A copy of a "Medical/Surgical and Referral Request" for Plaintiff dated February 28, 2012 (Id., pp. 4 -7.); (6) A copy of a Memorandum dated March 2, 2012, from Cheryl Owens, Designator Office of Medical Designations and Transportation, denying a transfer request for Plaintiff (Id., p. 8.); (7) A copy of a "Medical/Surgical and Referral Request" for Plaintiff dated February 28, 2013 (Id., pp. 9 – 12.); (8) A copy of an e-mail dated February 25, 2013, from Dr. Allen to Bonnie Kosmicki regarding Plaintiff's transfer request (Id., p. 13.); (9) A copy of a Memorandum dated March 4, 2013, from Cheryl Owens, Designator Office of Medical Designations and Transportation, denying a transfer request for Plaintiff (Id., p. 14.); (10) A copy of an unsigned "Medical/Surgical and Referral Request" for Plaintiff dated May 29, 2013 (Id., pp. 15 - 17.); (11) A copy of an e-mail dated May 29, 2013, from Bonnie Kosmicki to Dr. Allen regarding Plaintiff's transfer request (Id., p. 18.); (12) A copy of e-mail correspondences dated May 30, 2013, with Dr. McLain (Id., pp. 19 – 20.); (13) A copy of an e-mail dated May 31, 2013, to Bonnie Kosmicki from Dr. Allen regarding the denial of Plaintiff's transfer request (Id., p. 21.); (14) The Declaration of David Hutchison (Document No. 16-5.); (15) The Declaration of Kevin Thompson (Document No. 16-6.); (16) The Declaration of Tiffanie Little (Document No. 16-7, pp. 1 – 2.); (17) A copy of the "Public Information Inmate Data As of 08-24-2017" for Plaintiff (Id., pp. 3 – 5.); and (18) A copy of the "Administrative Remedy Generalized Retrieval" for Plaintiff dated August 24, 2017 (Id., pp. 6 – 23.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on August 31, 2017, advising him of the right to file a response to the Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 18.)

On September 25, 2017, Plaintiff filed his Response in Opposition. (Document No. 19.)

## FACTUAL HISTORY

In March 2009, Plaintiff was transferred from FCI Manchester, Kentucky, to FCI Beckley, West Virginia. Plaintiff's transfer paperwork noted that Plaintiff had a history of noncompliance with medical treatment, degenerative changes in the lumbosacral region, and benign essential hypertension. (Civil Action No. 5:11-0870, Document No. 26-2, pp. 62 - 63.)[3] Plaintiff medications included Atenolol, Hydrochlorothiazide, and Piroxicam. (Id.) An Intake Health Screening was conducted on March 30, 2009, where it was noted that Plaintiff had adult onset hypertension and chronic back pain secondary to a motor vehicle accident in 1991. (Id., pp. 58 - 61.) Plaintiff's medications were renewed and he was instructed on "how to obtain medical, dental, and mental health care." (Id., p. 61.) Additionally, Plaintiff was given a lower bunk pass because of his previous back and pelvic injuries. (Id.)

By Administrative Note entered on February 5, 2009, Lab Tech Janet Hagan noted that Plaintiff was a "no show for hospital labs." (Id., p. 57.) On April 7, 2009, Plaintiff was evaluated by Dr. Dominick McLain during a Chronic Care Visit. (Id., pp. 53 - 56.) Plaintiff stated that "nonsteroidals do not help his pain much" and "I was sent here for pain control." (Id., p. 53.) Dr. McLain noted that Plaintiff's "pelvic x-rays showed asymmetry of the symphysis public by 1.5 cm. Lumbar spine showed degenerative changes. No new problems admitted to." (Id.) Plaintiff informed Dr. McLain that Ibuprofen worked better at relieving his pain. (Id., p. 54.) Dr. McLain

---

[3] In Civil Action No. 5:11-0870, Plaintiff alleged inadequate medical care. Plaintiff's medical record through 2012 were filed and summarized by the Court in the foregoing case. Neither party disputes the summary and the undersigned will adopt and use the same summary as to Plaintiff's medical treatment through 2012.

ordered Ibuprofen and discontinued the Piroxicam. (Id., p. 55.) Dr. McLain renewed the Atenolol and Hydrocholorothiazide for treatment of Plaintiff's hypertention. (Id.) Dr. McLain also ordered several labs. (Id.)

On July 22, 2009, Plaintiff was evaluated by Physician Assistant Hank Shrewsbury during a Chronic Care Visit. (Id., pp. 48 - 50.) PA Shrewsbury noted that Plaintiff had a "history of lumbago from an old injury in motor vehicle accident. He states that he takes the medication Motrin for back pain and that blood pressure is okay on meds. No new complaints." (Id., p. 48.) PA Shrewsbury refilled Plaintiff's medications. (Id., p. 50.)

On August 24, 2009, Plaintiff reported to sick call complaining of "ongoing back pain and weakness in right leg." (Id., pp. 45 - 47.) Plaintiff stated that he "stopped trazodone because it did not help." (Id.) Plaintiff was examined by Nurse Practitioner James Ellis, who noted that Plaintiff had a favoring gait. (Id., p. 46.) Nurse Practitioner Ellis ordered Doxepin for pain, issued Plaintiff a medical idle until the end of September, and ordered a cane with a cane pass. (Id.)

On September 22, 2009, Plaintiff reported to sick call complaining of "pain in lower back and right leg" and "reports pill line mediation and NSAID is not helping at all." (Id., p. 42.) Plaintiff was evaluated by Nurse Practitioner Ellis, who noted that Plaintiff requested "to be placed on narcotic medication to treat his pain or he will consider it torture 'because of policy'" and "he will contact his State Senator if we do not treat his pain as requested." (Id.) Plaintiff's x-rays and MRIs were reviewed, which revealed a history of pelvic fracture, degenerative changes in the back and some disc bulging, and degenerative changes in the right and left hip. (Id.) On examination, Plaintiff's straight leg raise was positive on the right. (Id., p. 43.) Nurse Practitioner Ellis noted that Plaintiff refused to perform a range of motion test for his lumbar spine because "he reports

6

too much pain to bend forward even 10 degrees." (<u>Id.</u>) Nurse Practitioner Ellis indicated that "inmate can sit normally upright in a chair and on the exam table with hips and LS flexed at 90 degrees. Subjective presentation does not accurately represent severity of objective finding on current physical exam and previous radiological studies as noted above." (<u>Id.</u>) Nurse Practitioner Ellis increased the Doxepin dosage to 100 mg orally at bedtime and denied his request for transfer. (<u>Id.</u>, p. 44.)

On October 6, 2009, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (<u>Id.</u>, pp. 38 - 41.) Plaintiff reported that his low back pain and pelvic pain "is slightly improved with Ibuprofen three times per day" and "requested something be added to the Ibuprofen to assist with his pain." (<u>Id.</u>, p. 38.) Dr. McLain continued Plaintiff's prescription for Doxepin and added Valproic Acid capsules 500 mg every evening at pill line for treatment of pain. (<u>Id.</u>, p. 40.)

By Administrative Note entered on November 12, 2009, Nurse Practitioner Ellis noted that Plaintiff reported that the Valproic Acid and Doxepin were not helping his pain and Plaintiff requested "to switch to Neurontin." (<u>Id.</u>, p. 34.) Nurse Practitioner Ellis indicated that he would defer the request to a physician. (<u>Id.</u>)

On December 8, 2009, Plaintiff reported to sick call requesting that his pain medication be changed to Neurontin. (<u>Id.</u>, p. 30.) Plaintiff stated that his back pain was severe and he was only getting minimal relief with current medication. (<u>Id.</u>) Plaintiff admitted "to taking Motrin 800 mg (all three pills) in the morning at the same time just 'to get going.'" (<u>Id.</u>) Nurse Practitioner Ellis examined Plaintiff, noting tenderness, decreased range of motion, and straight leg raise caused back pain. (<u>Id.</u>, p. 31.) There was no radiculopathy, atrophy or neurological deficits on examination, and the pain was subjectively described in the back only. (<u>Id.</u>, p. 32.) Nurse

7

Practitioner Ellis denied Plaintiff's request for Neurontin and continued the same medications on the same dosages. (Id.) Nurse Practitioner Ellis noted that a chair in the cell would be allowed to facilitate access to Plaintiff's locker since he was complaining of pain while bending. (Id.) Nurse Practitioner Ellis added the restriction of no prolonged standing and no bending at the waist to Plaintiff's Medical Duty Status. (Id.)

On January 5, 2010, Plaintiff was evaluated by Nurse Practitioner Ellis at the Chronic Care Clinic. (Document No. 26-3, p. 67.) Plaintiff complained of right knee pain and chronic hip and lower back pain. (Id.) Plaintiff requested an increase in the Valproic Acid medication. (Id.) Nurse Practitioner Ellis granted Plaintiff's request and increased the Valproic Acid to 1000 mg at bedtime on pill line. (Id., p. 70.) Nurse Practitioner Ellis also requested an x-ray of Plaintiff's right knee, which was conducted on January 13, 2010. (Id., p. 71.)

On April 1, 2010, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (Id., pp. 63 - 66.) Plaintiff complained of chronic low back pain with shooting pain down the right leg and reported little to no relief with current pain medications. (Id., p. 63.) Dr. McLain prescribed Gabapentin (Neurontin) for pain and continued his prescription for the Ibuprofen and Doxepin. (Id., p. 65.)

By Administrative Note entered on April 15, 2010, Nurse Practitioner Ellis noted that Plaintiff reported that the Neurontin was "not effective after 2 weeks." (Id., p. 61.) Plaintiff again requested transfer to a medical facility. (Id.) Nurse Practitioner Ellis noted that he discussed the matter with Dr. McLain, who recommended that Plaintiff continue current treatment. (Id.) Nurse Practitioner Ellis explained to Plaintiff that "it may take longer than 2 weeks for him to experience the full effectiveness of the medication." (Id.) Nurse Practitioner Ellis further recommended

8

weight loss and exercise as tolerated, but Plaintiff disagreed with the recommendation and left the office in protest." (Id.)

By Administrative Note entered on May 25, 2010, Nurse Practitioner Ellis noted he revoked Plaintiff's "chair pass" due to Plaintiff's misuse of the authorized medical equipment. (Id., p. 60.) Specifically, Nurse Practitioner Ellis noted that the "chair pass" was given to facilitate access to his locker, but unit team members reported that Plaintiff was using his cell chair to read books and lounge. (Id.)

On June 22, 2010, Plaintiff was examined by Nurse Practitioner Ellis at the Chronic Care Clinic. (Id., pp. 54 - 59.) Plaintiff reported "minimal relief from Neurontin" and "increased symptoms of pain and weakness in right leg." (Id., p. 54.) Plaintiff again requested transfer to a medical facility. (Id.) Nurse Practitioner Ellis noted some muscle atrophy in Plaintiff's right leg. (Id., p. 56.) Nurse Practitioner Ellis ordered an MRI of the lumbosacral spine due to the findings on the physical exam and ineffectiveness of attempted treatment. (Id., p. 58.)

On September 21, 2010, Plaintiff was examined by Dr. McLain at the Chronic Care Clinic. (Id., pp. 50 - 53.) Plaintiff continued to complain of chronic low back pain and weakness in the right leg. (Id., p. 50.) Dr. McLain noted that Plaintiff's MRI was scheduled for the next day. (Id.) Dr. McLain indicated that Plaintiff had "some mild weakness of the right leg" and "no obvious muscular atrophy when examining both legs." (Id., p. 51.) Dr. McLain noted that a plan of care will be determined "after his MRI is done and the results obtained." (Id., p. 52.) On September 22, 2010, Plaintiff was transported to an outside hospital for the MRI but the MRI could not be conducted due to Plaintiff's size. (Id., p. 47.) Plaintiff explained that "I wouldn't fit in the machine, they put me in and my shoulders hit the sides and the machine stopped." (Id.) The MRI was

rescheduled and performed on October 6, 2010. (Id., pp. 44 - 45.)

On December 13, 2010, Plaintiff was evaluated by Nurse Practitioner Ellis at the Chronic Care Clinic. (Id., pp. 38 - 43.) Plaintiff reported increased pain in the lower back. (Id., p. 38.) Plaintiff complained that "current meds are only minimally effective" and requested transfer to a medical center. (Id.) Nurse Practitioner Ellis note that Plaintiff's had gained weight due to lack of exercise.   (Id.) The MRI revealed no acute fracture to lumbar spine or thoracic spine, multiple level degenerative changes of the discs, discs bulging at L3-5 and L4-5, no herniated disc or masses, no evidence of acquired spinal canal stenosis, and minimal facet arthropathy on the left side at L4-5. (Id., p. 39.) Plaintiff's medications were renewed. (Document No. 26-3, p. 41 and Document No. 26-4, pp. 43 - 45.) Nurse Practitioner Ellis submitted a consultation request for an evaluation and treatment by a neurosurgeon regarding the chronic low back pain. (Document No. 26-3, p. 41 and Document No. 26-4, p. 42.)

By Administrative Note entered on December 24, 2010, PA David Hutchison noted that Plaintiff had missed the morning pill line on six of the previous eleven days and "per policy . . . will be discontinued from AM pill line" for Neurontin. (Document No. 26-3, pp. 36 - 37.) It was noted that Plaintiff would continue to receive an 800 mg dose of Neurontin on the PM pill line. (Id.)

By letter dated January 4, 2011, Dr. McLain notified Plaintiff that the Utilization Review Committee [URC] had approved the request for a neurosurgery evaluation consult and it would be scheduled accordingly. (Document No. 26-4, p. 66.) On May 13, 2011, Plaintiff was evaluated by Dr. Jeffrey Greenberg, a neurosurgeon. (Id., p. 67.) Dr. Greenberg recommended that Plaintiff undergo a lumbar facet injection. (Id.) On June 7, 2011, the URC approved Plaintiff for a lumbar

facet injection by the neurosurgeon. (Id., p. 68.) Plaintiff underwent a set of injections in his L4/S1 and L5/S1 on September 29, 2011. (Id., p. 69.)

On October 31, 2011, Plaintiff was evaluated by Nurse Practitioner Ellis for a follow-up appointment. (Id., pp. 70 - 71.) Plaintiff reported that "he did not receive any relief from the pain injection in his back" and requested "to be transferred to another facility that has the ability to prescribe long-term chronic narcotics." (Id., p. 70.) Plaintiff stated that he was gaining weight due to his inability to exercise. (Id.) Nurse Practitioner Ellis requested a follow-up visit with Dr. Greenberg "for management recommendations as injection did not provide relief." (Id., pp. 71 and 73.)

On November 2, 2011, the URC approved the neurosurgical consult. (Id., p. 74.) Plaintiff had a follow-up appointment with Dr. Greenberg on February 8, 2012. (Id., p. 75.) Upon evaluation, Dr. Greenberg noted that Plaintiff was "intact neurologically," "range of motion of the lumbar spine is markedly decreased in all planes," and "straight-leg raising seems to be dramatically positive bilaterally." (Id.) Dr. Greenberg recommended that Plaintiff "go to a care level #3" stating that "perhaps that might be of benefit. There is nothing surgical that we can offer." (Id.) By Administrative Note entered on March 9, 2012, Dr. McLain noted he had received Dr. Greenberg's report, but "the outside neurosurgeon does not understand our care level system. During the last clinic visit, the patient stated to me he had requested the neurosurgeon to place that in his report hoping this would cause him to be transferred from this institution." (Id., p. 76.)

On February 17, 2012, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (Id., pp. 77 - 80.) Plaintiff continued to complain of chronic low back pain. (Id., p. 77.) Plaintiff reported that Neurontin "helps very little" and that the facet injections did not help. (Id.) Plaintiff

11

requested narcotics and muscle relaxants. (Id.) Dr. McLain increased his prescription for Neurontin. (Id., p. 79.)

On February 28, 2012, Dr. McLain requested Plaintiff's transfer to a Medical Referral Center. (Civil Action No. 5:17-2391, Document No. 16-4, pp. 4 - 7.) By Memorandum dated March 2, 2012, Cheryl Owens, Designator Office of Medical Designations and Transportation, notified FCI Beckley that the request was "denied at this time per Dr. Allen, Chief Health Programs, Health Services Division." (Id., pp. 2 and 8.) Dr. Allen stated that the "decision was based on recommendations from a local neurosurgeon against surgical intervention" and that the treatment plan for Plaintiff's chronic pain "could be provided locally and did not require the higher level of services available at a BOP medical center." (Id.) Dr. Allen determined that the "course of treatment undertaken at FCI Beckley was appropriate and adequate to manage Plaintiff's chronic pain." (Id.)

On February 22, 2013, Dr. McLain again submitted a "Medical/Surgical and Referral Request" for transfer of Plaintiff to a higher-level medical facility for treatment of his chronic pain. (Id., Document No. 16-2, pp. 43 – 46 and Document No. 16-4, pp. 9 - 12.) By Memorandum dated March 4, 2013, Cheryl Owens, Designator Office of Medical Designations and Transportation, notified FCI Beckley that the request was "denied at this time per Dr. Allen, Chief Health Programs, Health Services Division." (Document No. 16-2, pp. 43 – 46 and Document No. 16-4, p. 14.) It was recommended that "local resources be optimized, and the inmate be managed locally." (Id.) Dr. Allen stated that the reason for the denial was "there were not additional changes in the inmate's chronic condition, nor were there proposed changes to his treatment plan." (Id., Document No. 16-4, pp. 2, 13, and 21.)

12

On March 6, 2013, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (Id., Document No. 16-2, pp. 12 – 15.) Plaintiff complained of having a "good deal of pain in his lower back" that radiates down his right leg. (Id., p. 12.) Plaintiff, however, denied any bowel or bladder incontinence. (Id.) Dr. McLain noted that Plaintiff was recently seen by a neurosurgeon who felt no further facet injections were indicated and no surgery was indicated. (Id.) Dr. McLain increased his prescription for Neurontin and renewed his prescriptions for Atenolol, Doxepin, Triamterene, and Ibuprofen 800 mg. (Id., pp. 14 - 15.) On March 7, 2013, a Pharmacy Clinic Note Encounter was performed by Randy Seys, a Pharmacist who heads the Pain Management Clinic at FMC Butner. (Id., pp. 8 – 9.) Pharmacist Seys made recommendations regarding Plaintiff's medications and noted that "current literature for chronic [lower back pain] advises against long term use of opiates, opiates have minimal benefit for neuropathic/radiculopathic [symptoms], thus would advise against use in this patient." (Id., p. 9.)   By Administrative Note entered on March 26, 2013, Dr. McLain stated he had called the Regional Medical Director to discuss the pain management clinic plan for Plaintiff and was referred to the Pharmacist at FMC Butner, who heads the pain management clinic. (Id., p. 7.) Dr. McLain reviewed Pharmacist Seys' recommendations with Plaintiff, and advised Plaintiff that Pharmacist Seys felt like the pain would be better controlled if the medications were evenly delivered over the course of the day. (Id.) Despite the foregoing, Plaintiff stated that he wanted to stay on the afternoon and evening pill line because he did not think he could make the morning pill line as his pain was worse in the mornings. (Id.) Additionally, Dr. McLain prescribed oxcarbazepine 300 mg three times a day as recommended by Pharmacist Seys. (Id., pp. 7 and 42.) It was noted that Plaintiff would continue to be monitored at the clinic to see his response. (Id., p. 7.)

13

On May 29, 2013, Dr. McLain submitted a "Medical/Surgical and Referral Request" for transfer of Plaintiff to a higher level medical facility for treatment of his chronic pain. (Id., pp. 147 – 149 and Document No. 16-4, pp. 15 - 17.) The Request noted that "[a] consult with the Pain Management Clinic at FMC Butner has been completed and their recommendations have been followed without relief. Per their final recommendation a transfer to MRC is requested for more aggressive treatment." (Id.) The Central Office Utilization Review Nurse ("URN") noted no new recommendations in the treatment plan and suggested that FCI Beckley was requesting reconsideration of the previous denial. (Id., Document No. 16-4, pp. 2, and 19 – 20.) On the same day, Dr. Allen contacted the BOP Regional Medical Director for the Mid-Atlantic Regional and Dr. McLain to discuss the case. (Id., p. 19.) Dr. Allen noted although the Request stated that the Pain Management Specialist at Butner recommended transfer for "more aggressive management," Pharmacist Seyes' report from March 7, 2013, "only indicates that methadone is an MRC initiation only med but that opiates are generally not recommended for long term LBP management." (Id.) During the above discussion, all parties agreed that "Plaintiff did not require a higher level of care and that his treatment needs could be met locally at FCI Beckley." (Id., pp. 2 and 21.)

On May 30, 2013, Plaintiff was evaluated by PA David Hutchison at the Chronic Care Clinic. (Id., pp. 2 – 5.) Plaintiff complained of chronic lower back and hip pain radiating into his legs. (Id., p. 2.) Plaintiff again denied bowel or bladder incontinence. (Id.) Plaintiff further reported that oxcarbazepine had provided no noticeable pain relief. (Id.) PA Hutchison noted that Plaintiff had a case referral to a pain management clinic and again reviewed the recommendations with Plaintiff. (Id., pp. 2 and 5) PA Hutchison then prescribed acetaminophen 325 mg three times a day for pain based on the recommendations made by the pain management clinic. (Id., p. 3.) PA

14

Hutchison also renewed Plaintiff's prescriptions for Atenolol, Doxepin, Gabapentin, Ibuprofen, Oxcarbazepine, and Triamterene. (Id., p. 4.)

By Administrative Note entered on July 24, 2013, Pharmacist Seys noted that a telephone conference call was conducted with Plaintiff and Dr. McLain present regarding Plaintiff's pain management options. (Id., pp. 84 – 86.) Plaintiff notified Pharmacist Seys that the current medications were not controlling his pain. (Id.) Plaintiff advised that prior to incarceration he functioned well with Oxycontin, Xanax, and muscle relaxants. (Id.) Pharmacist Seys noted that a review of Plaintiff's thoracic and lower spine were unremarkable except for old fusion of the right L5 and sacrum and were negative for herniation and stenosis. (Id.) Pharmacist Seys recommended some changes to Plaintiff's medications, the ordering of updated imaging, weight reduction, and a shoe wedge due to Plaintiff's leg length discrepancy. (Id., p. 85) Finally, Pharmacist Seys noted that Plaintiff's "civilian medication regimen would be good for sedation, however, its benefit for neuropathic pain would be questionable." (Id.) By Administrative Note entered on August 8, 2013, Dr. McLain ordered x-rays and requested an orthotic consult due to Plaintiff's leg length discrepancy. (Id., p. 82.) X-rays of Plaintiff's pelvis and lumbar spine were performed on August 19, 2013. (Id., pp. 136 and 138.) The pelvis x-rays were "negative except for mild degenerative joint disease" and the lumbar spine x-rays were "negative except for moderate degenerative disc disease." (Id.) The URC approved Plaintiff's orthotic consult and Plaintiff was seen by Excel Orthotic on August 21, 2013, for his initial consult and he was fitted for a molded right pelite wedge. (Id., pp. 80 and 134 - 135.)

On August 27, 2013, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (Id., pp. 74 – 79.) Plaintiff complained of chronic lower back and hip pain radiating into his legs.

15

(Id., p. 74.) Plaintiff described shooting pain and tingling to his toes at times. (Id.) Plaintiff further complained of neck pain with tingling down his right arm at times. (Id.) Plaintiff stated that the burning sensation in his right arm was worsening. (Id.) Dr. McLain noted that Plaintiff's blood pressure was controlled and Plaintiff was medication compliant. (Id.) Dr. McLain further noted that Plaintiff had been seen by orthotics and a shoe lift would be provided. (Id.) Upon examination, Dr. McLain noted that Plaintiff had good bilateral hand grips, no muscle atrophy, good strength of upper arms, good range of motion of the arms, no focal neurological deficits, and minimal pain with the range of motion of the neck. (Id.) Dr. McLain did note that Plaintiff walks with a mild limp. (Id.) Dr. McLain increased the dosage of Plaintiff's prescription for Gabapentin and Oxcarbazepine and renewed his other medications. (Id., pp. 76 – 77.) Finally, Dr. McLain ordered lab work and x-rays of Plaintiff's neck/cervical spine. (Id., p. 78.) Plaintiff's x-rays were conducted on October 2, 2013, and revealed negative findings. (Id., pp. 130 and 132.)

By Administrative Note entered on October 2, 2013, medical staff noted that Plaintiff received his right molded pelite wedge from Excel Orthotics and acknowledged a "good fit." (Id., p. 72.) By Administrative Note entered on October 4, 2013, PA Hutchison noted that Plaintiff was "on maximum medical therapy at this institution" and Plaintiff had just received his orthotic. (Id., p. 71.) On December 10, 2013, Plaintiff was evaluated by PA Hutchison at the Chronic Care Clinic. (Id., pp. 65 – 69.) Concerning his chronic back pain, Plaintiff stated that he continued to take his medication but there was no improvement. (Id., p. 65.) Plaintiff mainly complained of esophageal reflux and an abdominal hernia. (Id.) Plaintiff stated that over the last couple of weeks, he had developed worsening esophageal burning after he eats, belching, and reflux into the mouth. (Id.) Plaintiff denied melena, hemoptysis, and hematemesis. (Id.) Plaintiff complained of increased

16

abdominal pain and stated he had an umbilical hernia repaired seven years ago. (Id.) Plaintiff denied any fever, chills, diarrhea, or severe pain. (Id.) PA Hutchison ordered lab work and submitted a consult request for general surgery to evaluate Plaintiff for a recurrence of an umbilical hernia. (Id., p. 68.) PA Hutchinson prescribed Omeprazole for treatment of Plaintiff's esophageal reflux and renewed his other medications. (Id., p. 67.)

The consult request was subsequently approved and Plaintiff was evaluated by an outside general surgeon on February 4, 2014, concerning his abdominal pain and hernia. (Id., pp. 62 – 63, 124 - 125.) The surgeon indicated that any repair of the hernia would be a failure at this time due to the size of Plaintiff's abdomen and weakness of his abdominal wall. (Id., pp. 124 – 125 and Document No. 16-1, p. 7.) Plaintiff was advised to lose 30 to 40 pounds and exercise to strengthen his abdominal wall muscles. (Id.) On March 14, 2014, PA Hutchison reviewed the surgeon's recommendations with Plaintiff. (Id., Document No. 16-2, p. 61.)

On April 4, 2014, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic for hypertension, chronic lower back pain, and esophageal reflux. (Id., pp. 56 – 60.) Plaintiff's blood pressure was doing well and he did not complain of chest pain or shortness of breath. (Id., p. 56.) Plaintiff complained that the pain in his right leg had gotten worse and that his right leg felt somewhat weaker and swollen. (Id.) Plaintiff stated he had been trying to walk for the past six weeks. (Id.) Plaintiff denied any gastrointestinal issues and stated that the Omeprazole was controlling his reflux symptoms. (Id., p. 57.) Dr. McLain advised Plaintiff that he would request a hernia belt to accommodate him and request further recommendations from the Pain Specialist at FMC Butner regarding Plaintiff's lower back pain. (Id., p. 60.) Dr. McLain further notified Plaintiff that if his lower back symptoms worsened, a repeat MRI would be necessary in the future.

(<u>Id.</u>) Dr. McLain renewed Plaintiff's medications and instructed him to follow-up in three months. (<u>Id.</u>, pp. 59 – 60.)

By Administrative Note entered on April 11, 2014, the Chief Pharmacist noted that Plaintiff's prescription for Oxcarbazepine was discontinued due to misuse of the medication. (<u>Id.</u>, p. 54.) It was noted that local formulary changed to yield Oxcarbazepine to only pill line status was made due to the high reports of medication abuse on the compound and multiple medication overdoses. (<u>Id.</u>) Medical staff went to housing units and collected Oxcarbazepine from all inmates with an active self-carry prescription and medication counts were completed for each inmate. (<u>Id.</u>) For each inmate, it was calculated the number of tablets he should have remaining if the medication was taken as prescribed. (<u>Id.</u>) Any inmate missing greater than 30% of the medication he should have remaining, was deemed to be misusing his medication and the medication was discontinued. (<u>Id.</u>) Inmates taking the medication as prescribed were changed to pill line. (<u>Id.</u>) Plaintiff's Oxcarbazepine was refilled and picked up on March 31, 2014 for 135 tablets. (<u>Id.</u>) On April 11, 2014, Plaintiff's bottle contained only 58 tables, meaning Plaintiff used 77 of the 300 mg tablets in 11 days. (<u>Id.</u>) Therefore, Plaintiff's prescription for Oxcarbazepine was discontinued due to misuse of the medication. (<u>Id.</u>)

On April 22, 2014, a Pharmacy Clinic Note Encounter was performed by Pharmacist Seys regarding Plaintiff's pain management. (<u>Id.</u>, pp. 51 – 52.) Pharmacist Seys noted that Plaintiff had missed 50 Gabapentin doses since January 2014, had been non-compliant with life- style modifications, and his prescription for Oxcarbazepine had been discontinued due to misuse. (<u>Id.</u>) Pharmacist Seys recommended a conservative pain management approach due to Plaintiff's non-adherence/compliance. (<u>Id.</u>) It was further recommended that all medications for pain management

18

be placed on pill line to ensure compliance. (Id.) Finally, Pharmacist Seys recommended that Plaintiff continue taking Gabapentin, Acetaminophen/Ibuprofen, and Doxepin. (Id.)

On August 1, 2014, Plaintiff was evaluated by PA David Hutchison at the Chronic Care Clinic. (Id., pp. 164 – 167.) Plaintiff stated that his reflux had improved significantly since starting Omeprazole and he had no complaints of abdominal pain. (Id., p. 164.) Plaintiff continued to complain of chronic lower back pain and stated that he was taking his medication as directed. (Id.) Plaintiff further stated that he was trying to lose weight in order to be approved for hernia surgery. (Id.) PA Hutchison renewed Plaintiff's prescriptions for Acetaminophen, Atenolol, Doxepin, Gabapentin, Ibuprofen, Omeprazole, and Triamterene. (Id., pp. 165 – 166.) PA Hutchison gave Plaintiff a pair of compression stockings and advised him to follow-up as needed. (Id., p. 167.)

On October 28, 2014, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (Id., pp. 159 – 163.) Plaintiff advised that his chronic lower back pain remained the same and he stated that "I just try to deal with it." (Id., p. 159.) Plaintiff stated that his right leg was chronically swollen, but the compression stockings helped somewhat. (Id.) Plaintiff continued to report that esophageal reflux was well controlled with Omeprazole. (Id., p. 160.) Dr. McLain renewed Plaintiff's prescriptions and instructed him to follow-up in three months. (Id., p. 163.)

On March 4, 2015, Plaintiff was evaluated by PA Hutchison at the Chronic Care Clinic. (Id., pp. 154 – 157.) Plaintiff stated that he was continuing to do well with Omeprazole regarding his esophageal reflux and denied any chest or abdominal pain. (Id., p. 154.) Plaintiff failed to report any new complaints related to his chronic lower back pain. (Id.) PA Hutchison renewed Plaintiff's prescriptions and instructed him to follow-up as needed. (Id., pp. 156 – 158.)

On July 8, 2015, Plaintiff reported to sick call complaining of worsening lower back pain

that was "severe" and increased right knee pain. (Id., pp. 150 – 153.) Plaintiff stated that his current medication regimen was insufficient to help with his pain and requested that use of methadone. (Id., p. 150.) Plaintiff stated that Tylenol 3 caused him to have gastrointestinal bleeding in the past. (Id.) Concerning his right knee, Plaintiff complained of increased pain, swelling, and popping. (Id.) Plaintiff stated that his pain has gradually been getting worse, but his knee pain was mild compared to his back pain. (Id.) On exam, PA Hutchison noted swelling, tenderness, and crepitus of the right knee. (Id., pp. 151 – 152.) PA Hutchison ordered x-rays and submitted a consult request for evaluation by an orthopedic surgeon regarding Plaintiff's right knee. (Id., p. 152.) Finally, PA Hutchison reviewed Plaintiff's medications noting that Plaintiff was currently on NSAID, Tylenol, Neurontin, and Doxepin. (Id.) No changes to Plaintiff's medications were made at that time. (Id.)

On July 16, 2015, the URC approved Plaintiff's referral to an orthopedist regarding his knee. (Id., pp. 243 and 300.) On July 17, 2015, x-rays of Plaintiff's right knee were performed and Plaintiff was evaluated by Dr. Stephen Whitfield, an orthopedic surgeon. (Id., pp. 295 – 298, 301.) Dr. Whitfield noted that Plaintiff's x-ray results revealed minimal degenerative changes of the medial, lateral and patellofemoral compartments. (Id., p. 297.) Dr. Whitfield evaluated Plaintiff and determined that Plaintiff had mild degenerative changes to the patellofemoral and medial compartment and a possible medial meniscal tear. (Id.) Dr. Whitfield stated that an MRI would be beneficial for determining whether Plaintiff's main problem was the meniscus or arthritis. (Id., p. 297.) Dr. Whitfield instructed Plaintiff to work on range of motion exercise as well as strengthening exercises in order to try to rehab the knee so that no further treatment would be necessary. (Id., p. 298.)

On July 28, 2015, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (Id.,

20

pp. 238 – 242.) Plaintiff continued to complain of lower back pain that radiates down his right leg and requested methadone. (Id.) Dr. McLain noted that lumbar facet injections did not help with Plaintiff's pain, the neurosurgeon felt no surgery was indicated, and there had been a prior teleconference with the Pain Management Specialist at FMC Butner. (Id.) Dr. McLain ordered lab testing and submitted a consult request for an MRI of Plaintiff's lumbar spine to determine further treatment options (Id., pp. 241 – 242.) Additionally, Dr. McLain renewed Plaintiff's medications. (Id., pp. 240 – 241.) On August 25, 2015, the URC approved the request for an MRI. (Id., p. 294.)

On September 16, 2015, PA Hutchinson performed a medication reconciliation encounter due to Plaintiff's placement in the Special Housing Unit ("SHU"). (Id., pp. 235 – 236.) PA Hutchinson noted that Plaintiff's medication had to be adjusted because there were only two pill lines in SHU, compared to three pill lines for general population. (Id.) On October 19, 2015, medical staff completed a medical trip return encounter noting that Plaintiff "went out for an MRI of [his] back" but it had to be rescheduled. (Id., p. 233.) On November 5, 2015, PA Hutchison evaluated Plaintiff regarding his complaint of an intensely pruritic rash on his forearms, chest, abdomen, and legs. (Id., pp. 231 – 232.) Plaintiff reported that he had tried over-the-counter hydrocortisone cream with little improvement. (Id.) Plaintiff reported that over-the-counter antifungal cream provided no improvement. (Id.) Plaintiff was diagnosed with scabies after being examined by PA Hutchinson and Dr. McLain. (Id., p. 232.) Plaintiff was prescribed permethrin cream. (Id.) On December 21, 2015, medical staff made a medical trip return encounter noting that Plaintiff had returned from an outside medical trip where an MRI was performed. (Id., pp. 227 – 228.) Plaintiff's MRI revealed mild canal stenosis at L4-5 with mild narrowing of the neural foramina, right foraminal protrusion at L3-4 with mild narrowing of the inferior aspect of the

21

neural foramen, and mild posterior disc protrusion at L2-3 with mild narrowing of the inferior aspect of the neural foramen. (<u>Id.</u>, pp. 285 – 287.)

On January 12, 2016, Plaintiff was evaluated by PA Hutchison at the Chronic Care Clinic. (<u>Id.</u>, pp. 221 – 225.) Plaintiff stated that he continued to take his medications as prescribed and had no complaints of abdominal pain. (<u>Id.</u>, p. 221.) Plaintiff, however, stated that he continued to have low back pain without any improvement with medications. (<u>Id.</u>) PA Hutchison noted that Plaintiff's recent MRI demonstrated widespread arthritis and degenerative disc disease, but no severe canal stenosis was identified. (<u>Id.</u>) PA Hutchison ordered labs, renewed Plaintiff's medications, and instructed Plaintiff to follow-up as needed. (<u>Id.</u>, pp. 222 – 224.) On February 4, 2016, PA Hutchison entered an administrative note to place a renewal order for Plaintiff's prescription for Doxepin. (<u>Id.</u>, p. 219.)

By Administrative Note entered on March 23, 2016, PA Hutchison noted a medication reconciliation encounter with Plaintiff regarding formulary change of Neurontin (Gabapentin). (<u>Id.</u>, p. 217.) PA Hutchison noted that he discussed in detail that Plaintiff would be tapered off Neurontin and placed on Cymbalta. (<u>Id.</u>) PA Hutchison stated that he answered all questions and explained possible side effects. (<u>Id.</u>) Plaintiff, however, stated that he was not agreeable to the plan at this time because the medication consent form states that Cymbalta is used for psychiatric treatment. (<u>Id.</u>) PA Hutchison advised Plaintiff that although Cymbalta is an antidepressant, it has also been approved for chronic pain. (<u>Id.</u>) Plaintiff continued to refuse Cymbalta even though Plaintiff was advised that his Neurontin would be tapered off regardless due to changes in formulary status. (<u>Id.</u>)

On June 24, 2016, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (<u>Id.</u>,

pp. 212 – 216.) Plaintiff stated that his chronic low back pain was an 8 out of 10 on most days. (Id., p. 212.) Plaintiff continued to complain of shooting pain down his right leg. (Id.) Plaintiff advised that he tried Cymbalta, but felt it "did nothing for my pain." (Id.) Plaintiff further reported some pain and paresthesia of the arms at time with hyperextension of the neck. (Id.) Dr. McLain noted that Plaintiff's MRI showed mild narrowing of the neural foramina of L2-3, L3-4, and L4-5. (Id.) Upon examination, Dr. McLain noted no focal neurological deficits and mild effusion of the right knee with some mild medial and lateral give as compared to the left knee. (Id., p. 214.) Dr. McLain renewed Plaintiff's medications, ordered lab work, and submitted a consult request for a neurosurgical consult concerning Plaintiff's chronic low back pain. (Id., pp. 215 – 216.)

On September 8, 2016, Plaintiff was evaluated by an outside neurosurgeon, Dr. John Feldenzer. (Id., pp. 313 – 314, 351 - 353.) Dr. Feldenzer examined Plaintiff and reviewed his MRI results. (Id., pp. 351 - 353) Dr. Feldenzer advised that Plaintiff's right leg symptoms were due to the traumatic sciatic nerve injury 25 years ago and recommended that Plaintiff receive Gabapentin as treatment. (Id., p. 353.) Dr. Feldenzer opined that Plaintiff was not a candidate for operative intervention in his back because "there is simply nothing there to operate on that would give him relief of his current and chronic symptoms." (Id.) Dr. Feldenzer stated that Plaintiff "might benefit from a right sacroiliac steroid injection and I think he should be referred to a pain clinic for pain management. A spinal cord stimulator or morphine pump may be of benefit. He does not need neurosurgical follow-up." (Id.) Finally, Dr. Feldenzer noted that he discussed Plaintiff's obesity and the need for him to change his diet and reduce carbohydrate intake as much as possible. (Id.)

On December 8, 2016, Plaintiff was evaluated by PA Hutchison at the Chronic Care Clinic. (Id., pp. 308 – 311.) Plaintiff continued to complain of chronic lower back pain, but stated that

23

while the pain was severe, it had not changed since his last chronic care visit. (Id., p. 308.) PA Hutchison noted that Plaintiff had recently been seen by an outside neurosurgeon who did not recommend any surgical intervention. (Id.) PA Hutchison renewed Plaintiff's medications, ordered lab work, and instructed Plaintiff to follow-up as needed. (Id., p. 310.)

On June 1, 2017, Plaintiff was evaluated by Dr. McLain at the Chronic Care Clinic. (Id., pp. 303 – 307.) Plaintiff continued to complain of chronic lower back pain that radiates down his right leg at times. (Id., p. 303.) Plaintiff stated that he felt his pain had worsened. (Id.) Plaintiff denied any urine or bowel incontinence. (Id.) Dr. McLain noted that Plaintiff had two neurosurgeon consultations and both neurosurgeons felt surgery was not indicated. (Id.) Dr. McLain further indicated that Plaintiff had a consultation with the pain management clinic at FMC Butner. (Id.) Dr. McLain noted that Oxcarbamazepine had been discontinued due to misuse and Plaintiff was currently taken Ibuprofen and Acetaminophen for pain control. (Id.) Dr. McLain renewed Plaintiff's medications and instructed him to follow-up as needed. (Id., pp. 305 – 306.)

On August 8, 2017, a Pain Management Clinic Encounter was performed by Pharmacist Seys regarding Plaintiff's pain management. (Id., pp. 358 – 359.) Pharmacist Seys recommended that Vitamin D and Gabapentin be added to Plaintiff's medications, and that Deoxepine be changed to Venlafaxine. (Id.) Pharmacist Seys recommended that Plaintiff continued taking Acetaminophen and NSAID. (Id.) By Administrative Note entered on August 10, 2017, Dr. McLain entered a new medication order for Vitamin D, Venlafaxine, and Gabapentin. (Id., p. 357.) Doxepin was discontinued. (Id., p. 357.) By Administrative Note entered on August 11, 2017, Dr. McLain noted he had discussed Pharmacist Seys' recommendations with Plaintiff. (Id., pp. 355 - 356) Dr. McLain requested Plaintiff sign a consent form for Venlafaxine (Effexor) because it is a

24

psychiatric drug, but Plaintiff became "belligerent and raised his voice" stating that "none of those damn medicines work. You know that." (Id., p. 355.) Dr. McLain noted that he asked Plaintiff what did work and Plaintiff stated "narcotics, this is what works and nothing else." (Id.) Dr. McLain explained to Plaintiff that narcotics were not indicated and the Pain Specialist agreed. (Id.) Dr. McLain noted that Plaintiff responded that "I ain't signing that damn sheet and you tricked me before and you won't put another one over on me." (Id.) Dr. McLain then ended the visit by telling Plaintiff that Gabapentin would be continued and he could notify health services if he changed his mind concerning Venlafaxine. (Id.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the

amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992); also see Goode v. Central Va. Legal Aide Society, Inc., 807 F.3d 619 (4th Cir. 2015).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Although the Court will view all underlying facts and inference in a light most favorable to the nonmoving party, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. Anderson, 477 U.S. at 252, 106 S.Ct. at 2505. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Id., 447 U.S. at 247-48, 106 S.Ct. at 2505. If no facts or inferences which can be drawn from the circumstances

will support Plaintiff's claims, summary judgment is appropriate.

<u>DISCUSSION</u>

1.    **Collateral Estoppel:**

In their Motion, Defendants argue that "Plaintiff's attempt to relitigate his <u>Bivens</u> claims from 2011 is barred by collateral estoppel." (Document No. 17, pp. 5 – 6.) Defendants claim that "Plaintiff makes largely the exact same claims in this litigation as he had in 2011." (<u>Id.</u>, p. 6.) Defendants explain that in his prior litigation, Plaintiff alleged Defendants Harmon, Snow, Thompson, McLain, and Ellis were deliberatively indifferent to his medical needs for his prior lower back injuries and his chronic pain. (<u>Id.</u>) Defendants note that in 2012, this Court determined Plaintiff's medical treatment was adequate and defendants were not deliberately indifferent to his medical needs. (<u>Id.</u>) Defendants conclude that "[a]llowing him to now pursue this litigation, once again against Defendants McLain and Thompson, as well as now Allen and Hutchison would be to permit 'repeated litigation of the same issue' merely because 'the supply of unrelated defendants holds out.'" (<u>Id.</u>)

In Response, Plaintiff argues that "[a] district court can reconsider a prior ruling if, in the interim, circumstances change or new evidence comes to light."[4] (Document No. 19, p. 1.) Plaintiff argues that "[s]ince the Court's ruling in December 2012, the treatment for pain that Plaintiff has been subjected to has remained virtually the same." (<u>Id.</u>) Plaintiff explains that medical staff

---

[4] In support of this argument, Plaintiff cites *Lynn v. Monarch Recovery Management, Inc.*, 953 F.Supp.2d 612, 620 (D.Md. June 17, 2013). The undersigned has reviewed this case and finds that it is inapplicable. The foregoing case involves a motion for reconsideration and does not address the issue of collateral estoppel. In the instant case, Plaintiff clearly initiated a new action by filing his Complaint and paying the $400 filing fee. There is no indication that Plaintiff intended to file a motion for reconsideration in Civil Action 5:11-0870.

continue to disregard Dr. Greenberg and Dr. Feldenzer's recommendations concerning management of Plaintiff's chronic pain. (Id., p. 2.) Plaintiff concludes that "[t]his new evidence supports Plaintiff's claim that his circumstances have not changed and the pain he suffered since his incarceration has actually gotten worse in spite of the treatment the BOP has applied to Plaintiff and the disregarding of two outside experts, years apart." (Id., pp. 2 – 3.)

On November 10, 2011, Plaintiff filed a Bivens Complaint in this Court naming the following as Defendants: (1) D.J. Harmon, Acting Warden; (2) Mike Snow, Unit Manager; (3) Mr. Thompson, Medical Director; (4) Dr. Dominic McLain; (5) James Ellis, Nurse Practitioner; and (6) Federal Bureau of Prisons. (Civil Action No. 5:11-0870, Document No. 1.) Plaintiff alleged that since March 2009, Defendants had acted with deliberate indifference to his back and pelvic injuries and his chronic pain. (Id.) Plaintiff alleged that he needed to be transferred to a medical center because FCI Beckley was unable to provide pain medication strong enough to adequately control his pain. (Id.) Defendants filed Motions to Dismiss, or in the Alternative, Motion for Summary Judgment. (Id., Document Nos. 26 and 28.) By Proposed Findings and Recommendations entered on September 4, 2012, United States Magistrate Judge R. Clarke VanDervort recommended that Defendants' Motions be granted based on the following: (1) There was no evidence of deliberate indifference regarding pain medications and transfer to a medical facility; (2) There was no evidence of deliberate indifference regarding revocation of a "chair pass;" and (3) Plaintiff's claims against Defendants Harmon and Thompson were improperly based upon a theory of *respondeat superior*. (Id., Document No. 50.) Plaintiff filed his Objections on September 18, 2012. (Id., Document No. 51.) By Memorandum Opinion and Order entered on December 18, 2012, United States District Judge Irene C. Berger overruled Plaintiff's Objections,

adopted Judge VanDervort's recommendation, granted Defendants' Motions to Dismiss, or in the Alternative, Motion for Summary Judgment, and dismissed Plaintiff's Complaint. (Id., Document Nos. 57 and 58.) On January 2, 2013, Plaintiff filed his Notice of Appeal. (Id., Document No. 59.) By Per Curiam Opinion entered on May 28, 2013, the Fourth Circuit affirmed the District Court's decision. (Id., Document Nos. 67 and 68.) On October 21, 2013, the United States Supreme Court denied Plaintiff's petition for writ of certiorari. Cline v. Ziegler, 571 U.S. 978, 134 S.Ct. 483, 187 L.Ed.2d 326 (2013).

The preclusive effects of the doctrines of *res judicata* and collateral estoppel are designed to promote judicial economy, encourage reliance on judicial decisions, and relieve parties from the expense of multiple lawsuits. See Parklane Hosiery Co. Inc. v. Shore, 439 U.S. 322, 326, 99, S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); Wright & Miller, § 131.12[4][a]. "Under *res judicata*, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." Young-Henderson v. Spartanburg Area Mental Health Center, 945 F.2d 770, 773 (4th Cir. 1991)(*quoting*, Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Collateral estoppel "precludes relitigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." In re McNallen, 62 F.3d 619, 624 (4th Cir. 1995). The doctrine of collateral estoppel applies if the following elements are satisfied: (1) "the issue sought to be precluded is identical to one previously litigated;" (2) "that the issue was actually determined in the prior proceeding;" (3) "that the issue's determination was 'a critical and necessary part of the decision in the prior proceeding;" (4) "that the prior judgment is final and valid;" and (5) "that the party against whom collateral estoppel is

29

asserted 'had a full and fair opportunity to litigate the issue in the previous forum." Collins v. Pond

Creek Mining Co., 468 F.3d 213 (4th Cir. 2003)(citation omitted); also see In re Microsoft Corp.

Antitrust Litigation, 355 F.3d 322, 326 (4th Cir. 2004)(same). The Court will consider the above-

referenced elements in determining whether the prior judgment entered by this Court in Civil

Action No. 5:11-870 precludes Plaintiff's claims against Defendants.

       To the extent Plaintiff is alleging deliberate indifference based upon Defendants' failure to

follow the recommendation of Dr. Greenberg, an outside neurosurgeon, the Court finds that the

above-referenced elements are satisfied. First, the undersigned finds that the above issue sought to

be precluded is identical to the one previously litigated, the issue was actually determined in the

prior proceeding, and the issue was a critical and necessary part of the decision in the prior

proceeding. Specifically, Plaintiff alleged that defendants engaged in deliberate indifference by

continuously failing to provide appropriate medication to control his pain and failing to transfer

Plaintiff to a medical facility for appropriate treatment based upon Dr. Greenberg's

recommendation. In the instant case, Plaintiff again complains that Defendants have disregarded

Dr. Greenberg's recommendation. In support, Plaintiff references Dr. Greenberg's February 8,

2012, recommendation that Plaintiff be transferred to a "care level # 3." As before, Plaintiff argues

that his transfer to a higher care level medical facility is necessary so that he can receive narcotic

pain medication, which is necessary and appropriate to control his pain. This Court specifically

rejected Plaintiff's claim that medical staff acted with deliberate indifference in failing to provide

adequate medication to control Plaintiff's chronic pain through March 2, 2012,[5] and in failing to

---

[5] In reaching the above decision, the Court reviewed and considered Plaintiff's medical records
through March 2, 2012.

transfer Plaintiff to a medical facility based upon Dr. Greenberg's recommendation. (Civil Action No. 5:11-0870, Document Nos. 50 and 57.) Finally, the undersigned finds that the prior judgment is final and valid and Plaintiff had a full and fair opportunity to litigate the above issue in the previous forum. Plaintiff appealed this Court's decision in Civil Action No. 5:11-0870 to the Fourth Circuit Court of Appeals. The Fourth Circuit Court affirmed the Court's decision on May 28, 2013, and United States Supreme Court denied Plaintiff's petition for writ of certiorari on October 21, 2013. <u>Cline v. Harmon</u>, 521 Fed.Appx. 209 (4th Cir. 2013); <u>Cline v. Ziegler</u>, 571 U.S. 978, 134 S.Ct. 483, 187 L.Ed.2d 326 (2013). Therefore, the undersigned finds that collateral estoppel precludes Plaintiff's present action against Defendants concerning Plaintiff's claim that Defendants acted with deliberate indifference in failing to provide adequate medication to control Plaintiff's chronic pain through March 2, 2012 and in failing to transfer Plaintiff to a higher level medical facility based upon Dr. Greenberg's recommendation.

To the extent Plaintiff is alleging deliberate indifference based upon Defendants' failure to follow the recommendations of Dr. Feldenzer, an outside neurosurgeon, the Court finds that the above-referenced elements are not satisfied. First, the undersigned finds that the above issue sought to be precluded is different from the issue previously litigated and the present issue was not addressed the prior proceeding. In the instant case, Plaintiff alleges that on September 8, 2016, Dr. Feldenzer recommended "a spinal cord stimulator or morphine pump" and that Plaintiff be referred to a pain clinic for pain management. Clearly, the issue of whether Defendants acted with deliberate indifference to Plaintiff's chronic lower back pain by disregarding Dr. Felezner's 2016 recommendation was not considered or decided by this Court in 2012. Furthermore, Plaintiff did not have a full and fair opportunity to litigate this issue in 2012. The undersigned, therefore, finds

that collateral estoppel does not preclude Plaintiff from now litigating the issue of whether Defendants acted with deliberate indifference to Plaintiff's chronic pain by failing to provide adequate medication and/or transferring him to a higher-level care facility based upon Dr. Feldenzer's 2016 recommendation. Based upon the foregoing, the undersigned respectfully recommends that the District Court deny in part and grant in part Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 16) based upon collateral estoppel.

**2.    Eighth Amendment Claim.**

As a general matter, punishments prohibited under the Eighth Amendment include those that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Inmates' claims, therefore, that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987); Moore v. Winebrenner, 927 F.2d 1312, 1316 (4th Cir. 1991) cert. denied, 502 U.S. 828, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991)(Stating that supervisory liability may be imposed where prison supervisors "obdurately," "wantonly," or "with deliberate indifference" fail to address a known pervasive risk

of harm to an inmate's health or safety). To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") Therefore, Plaintiff must first allege and eventually establish an objectively "sufficiently serious" deprivation. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and

33

establish that each Defendant was aware that there was a substantial risk to Plaintiff's health or safety and that Defendant disregarded the serious physical consequences.

Plaintiff alleges that Defendants acted with deliberate indifference in failing to provide adequate pain medication for his "catastrophic back and leg injury which he suffered in an automobile accident in 1991." For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Plaintiff alleges that his condition causes continuous severe pain and suffering. Accordingly, the undersigned will assume for purposes of this motion that Plaintiff's injuries were serious enough to give rise to an Eighth Amendment claim.[6]

Next, the undersigned will consider whether Defendants acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends Defendants acted with deliberate indifference in failing to provide him with appropriate pain medication for his chronic pain. Plaintiff alleges that medications provided at FCI Beckley were insufficient to control his pain and Defendants failed to transfer Plaintiff to a higher-level care facility where Plaintiff could receive narcotic pain medication. Plaintiff argues that Defendants disregarded Dr. Feldenzer's September 8, 2016 recommendation that Plaintiff might benefit from a "spinal cord stimulator or morphine pump" and should be referred to a pain clinic for pain management. Although Plaintiff alleges that

---

[6] For purposes of their Motion, Defendants do not dispute that Plaintiff suffers from a serious injury/condition. (Document No. 17, p. 7.)

Defendants disregarded Dr. Feldenzer's 2016 recommendation that Plaintiff be provided narcotic pain medication and referred to a pain clinic, the record reveals that Defendant McLain initially contacted FMC Butner regarding a pain clinic management plan for Plaintiff as early as March 2013. Although the Pain Clinic Specialist (Pharmacist Seys) noted that methadone was a possible option, he advised against such use because "current literature for chronic [lower back pain] advises against long term use of opiates [and] opiates have minimal benefit for neuropathic/radiculopathic [symptoms]."[7] Despite the foregoing, Defendant McLain submitted a transfer request for a higher-level care facility for more aggressive treatment based upon Plaintiff's continued insistence that only narcotic pain medication was effective. Defendant Allen, however, denied the transfer request after reviewing the Pain Clinic Specialist's report and discussing the issue with Defendant McLain and the Regional Medical Director for the Mid-Atlantic Region. Specifically, Defendant Allen concluded that methadone/opiates were not recommended for long-term lower back pain and Plaintiff's chronic pain could be managed locally at FCI Beckley. Due to Plaintiff's continued complaints of chronic pain, a conference call between the Pain Clinic Specialist, Defendant McLain, and Plaintiff occurred in July 2013. During the conference call, Plaintiff advised the Pain Clinic Specialist that Oxycontin, Xanax, and muscle relaxants adequately controlled his pain prior to incarceration. The Pain Clinic Specialist noted that Plaintiff's "civilian medication regimen would be good for sedation, however, its benefit for neuropathic pain would be questionable." The Pain Clinic Specialist recommended some changes to Plaintiff's pain medications, the ordering of updated imaging, weight reduction, and a shoe wedge due to Plaintiff's leg length discrepancy. The foregoing recommendations were followed by Defendant

---

[7] Opiates are classified as a narcotic drug.

McLain.

In April 2014, the Pain Clinic Specialist evaluated Plaintiff regarding his pain management and noted that Plaintiff had been non-compliant concerning his medications and life style modifications. The Pain Clinic Specialist, therefore, recommended a conservative pain management approach due to Plaintiff's non-compliance and that all medications for pain management be placed on pill line to ensure compliance. The Pain Clinic Specialist recommended that Plaintiff continue taking Gabapentin, Acetaminophen/Ibuprofen, and Doxepin. These recommendations were followed by Defendants. Until the evaluation with Dr. Feldenzer in September 2016, Defendant McLain and Defendant Hutchison continuously evaluated Plaintiff, ordered additional x-rays and an MRI, renewed his pain medications, and submitted a consult request for evaluation by an "outside" neurosurgeon.

On September 8, 2016, Plaintiff was evaluated and examined an "outside" neurosurgeon, Dr. Feldenzer. Dr. Feldenzer reviewed Plaintiff's MRI results, which demonstrated widespread arthritis and degenerative disc disease but no severe canal stenosis. Dr. Feldenzer advised that Plaintiff's right leg symptoms were due to the traumatic sciatic nerve injury 25 years ago and recommended that Plaintiff receive Gabapentin[8] as treatment. Dr. Feldenzer opined that Plaintiff was not a candidate for operative intervention in his back because "there is simply nothing there to operate on that would give him relief of his current and chronic symptoms." Dr. Feldenzer stated

---

[8] On March 23, 2016, PA Hutchison noted a medication reconciliation encounter with Plaintiff regarding formulary change of Gabapentin. PA Hutchison noted that he discussed in detail that Plaintiff would be tapered off Gabepentin and placed on Cymbalta. Plaintiff, however, stated that he was not agreeable to the change because the medication consent form states that Cymbalta is used for psychiatric treatment. PA Hutchison advised Plaintiff that although Cymbalta is an antidepressant, it has also been approved for chronic pain. Plaintiff continued to refuse Cymbalta.

that he believed Plaintiff should be referred to a pain clinic for pain management and that "[a] spinal cord stimulator or morphine pump may be of benefit." Following Dr. Feldenzer's evaluation, Defendants continued to evaluate Plaintiff and renew his prescriptions for the pain medications recommended by the Pain Clinic Specialist. On August 8, 2017, the Pain Clinic Specialist performed a pain management encounter regarding Plaintiff. The Pain Clinic Specialist recommended that Vitamin D and Gabapentin be added to Plaintiff's medications, and that Deoxepine be changed to Venlafaxine. The Pain Clinic Specialist further recommended that Plaintiff continue taking Acetaminophen and NSAID. By Administrative Note entered on August 10, 2017, Defendant McLain entered a new medication order for Vitamin D, Venlafaxine, and Gabapentin. On August 11, 2017, Defendant McLain discussed the Pain Clinic Specialist's recommendations with Plaintiff and requested Plaintiff sign a consent form for Venlafaxine (Effexor) because it is a psychiatric drug. Plaintiff, however, became "belligerent and raised his voice" stating that "none of those damn medicines work." Defendant McLain asked Plaintiff what did work, and Plaintiff stated "narcotics, this is what works and nothing else." Defendant McLain again explained to Plaintiff that narcotics were not indicated and the Pain Clinic Specialist agreed. Defendant McLain noted that he informed Plaintiff that Gabapentin would be continued and he could notify health services if he changed his mind concerning Venlafaxine.

Based upon the foregoing, Plaintiff cannot satisfy the subjective component. The foregoing does not exhibit that Defendants knew of and disregarded Plaintiff's need for pain medication or a transfer to a higher care level facility so narcotic pain medication could be administered. Thus, the Court finds that Defendants did not act with deliberate indifferent in providing medical treatment for Plaintiff's chronic pain. The undisputed medical record reveals that Defendants

evaluated Plaintiff and provided treatment following each sick-call request and chronic care visit. Defendants consistently evaluated Plaintiff's condition, ordered x-rays and MRIs, prescribed pain medications, increased dosages of the prescribed pain medications, submitted consult requests for referrals to a neurosurgeon, and contacted the Pain Management Specialist at FMC Butner for recommendations. Concerning Plaintiff's alleged need for pain medication, Defendants consistently provided Plaintiff with medications to control his pain. The record, however, reveals instants where Plaintiff misused his medication and was non-compliant by refusing certain medications. Specifically, Plaintiff refused to try at least two medications because they were classified as psychiatric drugs. Plaintiff refused these medications despite the Pain Clinic Specialist's recommendation of the medications and Defendant McLain's explanation that the psychiatric drugs were commonly used as pain medications. Thus, the medical records reveal that Defendants made sufficient efforts to treat Plaintiff's chronic pain. Plaintiff appears to simply disagree with the appropriate course of treatment. Specifically, Plaintiff is insistent that narcotic pain medication is necessary to adequately control his pain. An inmate's disagreement with his medical care or the course of treatment generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation."). Furthermore, the use of narcotic pain medication was considered and rejected by

Defendants on several occasions. Despite Dr. Feldenzer's recommendation that Plaintiff's "might benefit" from narcotics, Defendants rejected the recommendation based on the Pain Specialist's opinion that narcotics were not recommended for chronic long-term back pain or to treat neuropathic pain. Plaintiff's claim that Dr. Feldenzer's treatment plan was better than the Pain Specialist's treatment plan does not state a constitutional violation. See Lewis v. Proctor, 2010 WL 148383, * 3 (N.D.W.Va. Jan. 12, 2010)(an inmate's belief that one doctor's treatment plan was better than another's does not state a constitutional violation); Oglesby v. Abbassi, 2013 WL 4759249, * 7, n. 12 (E.D.Va. Sep. 4, 2013)("certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor"). At most, Defendants may have been negligent in prescribing appropriate medication for Plaintiff's pain. It is well recognized that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." Webb v. Hamidullah, 281 Fed.Appx. 159, 166 (4th Cir. 2008); also see Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Accordingly, the undersigned finds that Defendants did not act with deliberate indifference in providing medical treatment for Plaintiff's condition and failing to transfer him to a medical facility.[9]

---

[9]   The classification and transfer of federal prisoners falls within the broad discretion of the Bureau of Prisons, and a Court lacks authority to order that a prisoner be confined to any particular institution. See 18 U.S.C. § 3621(b)(the BOP shall designate the place of an inmate's confinement); also see Meachum v. Farno, 427 U.S. 215, 225, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976)(the transfer of a convicted and sentenced inmate is within the sound discretion of the BOP); United States v. Williams, 65 F.3d 301, 307 (2nd Cir. 1995)("A sentencing court has no authority to order that a convicted defendant be confined in a particular facility, much less placed in a particular treatment program; those decisions are within the sole discretion of the Bureau of Prisons."); Hinton v. Federal Bureau of Prisons, 2009 WL 3347158, * 4 n. 5 (S.D.W.Va. Oct. 14,

3.      **Plaintiff's claim against Defendant Thompson.**

Plaintiff names the following supervisory official, Kevin Thompson, Health Services Administrator, as a Defendant. Plaintiff appears to contend that Defendant Thompson violated his constitutional rights by failing to ensure that Plaintiff received proper medical treatment. (Document Nos. 1 and 2.) Specifically, Plaintiff contends Defendant Thompson acted with deliberate indifference by denying Plaintiff the "proper care required although it is available within the Bureau of Prisons and would not cause any burden on the BOP to initiate needed care." (Id.) Plaintiff further states that Defendant Thompson has "continued ineffective treatment of Plaintiff's prescribing medications that do little to alleviate Plaintiff's serious medical condition." (Id.)

In Defendants' Motion, Defendant Thompson contends that Plaintiff's claim against him are improperly raised based upon supervisory liability. (Document No. 17, pp. 14 – 15.) Specifically, Defendant Thompson states that "Plaintiff makes no actionable allegations against Defendant Thompson, but simply states in a conclusory fashion that he oversees the medical department at FCI Beckley." (Id., p. 15.) In support, Defendant Thompson filed a Declaration stating, in pertinent part, as follows:

> 2.      I am responsible for the oversight and supervision of the Health Services Department at FCI Beckley and the health care providers working in that department. My role is and was at all times relevant to the issues in the complaint, administrative and not as a health care provider.
>
> *  *  *
>
> 5.      I am not Plaintiff's primary care provider, nor am I directly involved in any decision on whether to transfer Plaintiff to a federal medical center.

---

2009)("Inmates . . . have no constitutional right to be housed in any particular prison or jail, regardless of security classification.").

(Document No. 16-6.). Therefore, Defendant Thompson argues that his "supervisory position and the general notion that he is responsible for the actions of his subordinates is simply insufficient to form the basis of a claim for violations of a constitutional right." (Document No. 17, p. 15.)

In Response, Plaintiff argues that "Dr. Thompson is just as liable as the other defendants as his supervisory position requires him to approve or disapprove any recommendations by BOP staff or outside consultants, and in doing so, he must be intimately familiar with the cases he is reviewing." (Document No. 19, p. 7.) Plaintiff further states that Defendant Thompson "has the final say as to what course of action to take." (Id.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 129 S.Ct. at 1948("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Also see Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly,

41

obdurately, or with deliberate indifference to the pervasive risk of harm." Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

Defendant Thompson argues that Plaintiff has failed to demonstrate specifically how he was personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendant Thompson violated his constitutional rights with respect to his failure to supervise employees. The evidence of record, however, does not indicate any personal involvement by Defendant Thompson. In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Born, 896 F.2d 848, 854 - 55 (4th Cir. 1990). In the instant case, there is no evidence that Defendant Thompson was personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the prison physicians' conduct. Accordingly, Plaintiff has improperly raised his claim against Defendant Thompson under the doctrine of *respondeat superior* and has failed to establish supervisory liability. The Court therefore finds that Defendant Thompson's "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" should be granted. The undersigned finds it unnecessary to consider the other reasons which the Defendants have submitted for dismissal.

## **PROPOSAL AND RECOMMENDATION**

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT in part and**

42

**DENY in part** the Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 16) and remove this matter from the Court's docket. Specifically, the undersigned recommends that Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 16) be **DENIED** as to Defendants' argument that collateral estoppel precludes Plaintiff's claim that Defendants acted with deliberate indifference by continuously failing to provide appropriate pain medication and failing to transfer Plaintiff to a medical facility based upon Dr. Feldenzer's recommendations. The undersigned recommends that Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 16) be **GRANTED** as to the following arguments: (1) Collateral estoppel precludes Plaintiff's claim that Defendants acted with deliberate indifference by continuously failing to provide adequate pain medication through March 2, 2012 and in failing to transfer Plaintiff to a higher level medical facility based upon Dr. Greenberg's recommendation; (2) Plaintiff cannot establish a claim of deliberate indifference to his medical condition; and (3) Plaintiff's claim against Defendant Thomas is inappropriately based upon supervisory liability.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Berger and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: June 22, 2018.

Omar J. Aboulhosn
United States Magistrate Judge